**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION<br>NO.  16-290 |
| v. | |
| MUADHDHIN BEY | |

## OPINION

Defendant Muadhdhin Bey is charged with being a felon in possession of a firearm in violation

of 18 U.S.C. § 922(g)(1). Bey moves to suppress all physical evidence and statements derived as a result

of the warrantless stop and search that led to the discovery of the firearm. On consideration of Bey's

motion, the government's opposition thereto, the parties' supplemental briefs, and after an evidentiary

hearing, the Court finds as follows:

I.       **FINDINGS OF FACT**

  A.   Vehicle stop at 1600 Point Breeze Avenue

At approximately 10 p.m. on March 28, 2016, Philadelphia Police Officers William Fritz and

Brandon McPoyle, who were on routine patrol in the City's 17th Police District,[1] working in full uniform

and driving a marked patrol car, observed the driver of a Buick LaCrosse roll through a stop sign as he

turned west from 19th Street onto Tasker Street. The officers pulled the car over at 1600 Point Breeze

Avenue, between Tasker and Fernon Streets, and parked behind it.

Fritz and McPoyle got out of their patrol car and approached the Buick, Fritz on the driver's side

and McPoyle on the passenger side. Fritz saw three men in the car – a driver, a front passenger, and a

rear passenger on the driver's side – and noticed that none of them were wearing seat belts. The officers

obtained driver's licenses or identifications from all three men, thus learning that the driver was Albert

---

[1] The 17th District is bounded at the south by Morris Street, at the north by South Street, at the east by Broad Street, and at the west by the Schuylkill River.

Lee, the front passenger was Amir Robinson, and the rear passenger was Lionel Burke. The officers returned to their patrol car and performed a warrant check on the three men, which proved negative.

On returning to the Buick, the officers smelled marijuana and noticed remnants of marijuana on the floorboard of the car. The officers decided to remove all three men from the vehicle, beginning with the rear passenger, Burke. Fritz escorted Burke to the rear of the Buick, where McPoyle performed a frisk. As McPoyle was frisking Burke, Fritz saw a .25-caliber Beretta handgun on the rear floorboard of the car, where Burke had been seated. Fritz retrieved the handgun and instructed McPoyle to handcuff Burke. Before McPoyle could handcuff Burke, however, Burke fled, running northbound on Point Breeze Avenue. McPoyle gave chase on foot. Fritz watched as McPoyle ran after Burke, losing sight of them after they both turned east on Tasker Street.

When Fritz turned back to face the Buick, he saw that the vehicle's front passenger door was now open. The front passenger, Robinson, was no longer in the vehicle. Fritz glanced southbound on Point Breeze Avenue but could see no sign of Robinson. The arrangement of the intersection led Fritz to infer that Robinson must have fled west on Fernon Street.

Fritz turned back to the Buick and saw that the driver, Lee, was still seated in the front of the vehicle. Fritz handcuffed Lee, placed him in the patrol car.  Returning to the empty Buick he saw a second firearm at the foot of the front passenger seat where Robinson had been seated and retrieved this second firearm.

Fritz was still in possession of the three men's driver's licenses. He knew, from those licenses and his observations, that the fleeing rear passenger was Burke and the fleeing front passenger was Robinson. Robinson's license contained his full name, photograph, date of birth, address, and height.

Fritz testified at the suppression hearing that he had been able to observe Robinson during the vehicle stop, albeit with a "limited vantage point" (since he had been standing on the Buick's driver's

2

side), and had seen that Robinson was a black male of average build, wearing a red hoodie or red jacket. Fritz testified that he was unable to see Robinson's legs from his vantage point.

B. Radio broadcasts by Officers Fritz and McPoyle, 10:00 - 10:03 p.m.

At 10:00:54 p.m., as McPoyle was running after Burke, Fritz broadcast over police radio that there was a foot pursuit northbound at Point Breeze Avenue and Reed Street (the "Initial Dispatch"). After some radio interference and responses from other police units, the dispatcher instructed: "everybody stay off the air." Around 10:01:30 p.m., McPoyle came on the air to report that he was chasing a black male. Just after 10:02 p.m., McPoyle broadcast that he had the male in custody at 2100 Fernon Street. Around 30 seconds later, Fritz broadcast that he had "a gun recovered and the passenger bailed . . . ."

At this point, there was some confusion over police radio as to how many passengers were still fleeing the car stop. After questioning by the dispatcher, Fritz stated: "My partner ran after Lionel Burke. The passenger we're looking for is Amir Robinson." This was just after 10:03 p.m.[2]

C. Officer Madara responds to the broadcasts

In the meantime, other police units were responding to Fritz's Initial Dispatch reporting the foot pursuit. Among the responding officers was Officer John Madara, who was patrolling nearby in a marked vehicle. Madara arrived at the car stop around 10:04 p.m. On arrival, he spoke with Fritz. Fritz explained that there had been a car stop, he had recovered firearms, two passengers had fled, and one of them – Robinson – was yet to be apprehended. Fritz handed Madara Robinson's driver's license. Fritz's testimony is that he told Madara that Robinson was wearing a red hoodie or red jacket, and that Robinson had fled westbound on Fernon Street.

---

[2] The confusion continued until just after 10:06 p.m. Between 10:03:30 p.m. and 10:05 p.m., the police dispatcher was broadcasting questions about whether any injuries had been sustained during McPoyle's foot pursuit and whether all of the Buick's passengers were accounted for. Just after 10:05 p.m., despite Robinson being on the run, the dispatcher broadcast: "You have both of them. It looks like everyone's accounted for now." Around 10:06:30 p.m., after receiving information that one passenger was still fleeing, the dispatcher broadcast: "Okay, they only have one male on Fernon Street."

At 10:06:46 p.m., Madara broadcast the following information over police radio (the "First Description"):

> OFFICER MADARA: We're looking for one male who's gonna be wearing a red hoodie. There will be further flashes.
>
> DISPATCHER: Whenever you're ready.
>
> OFFICER MADARA: His name is gonna be Robinson, Amir. It's gonna be a date of birth of 8-6-94, goes back to 1319 [inaudible] Street. He's wearing a red hoodie. Last seen westbound on Fernon Street.

After Madara broadcast the First Description, he spoke with Fritz again. Fritz gave Madara further descriptive information about Robinson, namely that he was wearing dark blue pants and looked about Madara's size "but skinnier." Madara is approximately 6' tall and weighed around 205 pounds in March 2016.

### D.  Officers Powell and Cherry respond to the broadcasts

In addition to Madara, Officers Ernest Powell and Philip Cherry, who were patrolling the area in a marked car and were at 2500 Morris Street (three blocks west and one block south of the car stop), responded to Fritz's Initial Dispatch. Powell turned on the patrol car's lights and sirens, and drove the wrong way up a one-way street to get to 1600 Point Breeze Avenue. On the way there, they heard Fritz's dispatch reporting that he had "a gun recovered and the passenger bailed."[3]  As they pulled up to the car stop, they heard the First Description (a fleeing male suspect by the name of Amir Robinson, wearing a red hoodie, born on August 6, 1994, last seen westbound on Fernon Street). Powell immediately spoke with Madara, who told him that the fleeing suspect was a black male, 6' to 6'1", about Madara's size but skinnier, around 160 to 170 pounds, wearing dark blue pants and either a red hoodie or a red jacket,[4]

---

[3] Powell responded to this dispatch, asking, "What was the passenger wearing?"

[4] The parties dispute the content of the verbal description Madara gave Powell. At the suppression hearing, Powell testified that Madara told him Robinson was wearing a red *jacket* (as opposed to a hoodie). The arrest report and all of Madara's radio broadcasts describe Robinson as wearing a red hoodie.

fleeing westbound on Fernon or Morris Street. Powell did not recall if Madara relayed information about whether the suspect had a beard.

Before Powell left the car stop, he saw a photograph of Robinson on the mobile data terminal ("MDT") in his patrol car. Although the photo Powell saw was not entered into evidence, a photo of Robinson dating from September 8, 2016 was. The latter photo shows that Robinson is a youthful, light-skinned black male. It also shows that, in September 2016, Robinson had a tattoo covering the front of his neck, a short moustache, narrow sideburns, and a small amount of facial hair underneath his chin.

Thus, by the time Powell left 1600 Point Breeze Avenue, he was aware of Robinson's full name, address, age, ethnicity, approximate height and weight, clothing, and had seen a photograph of him.

E. Officers Powell and Cherry proceed from the vehicle stop to Lid's Café

Powell and Cherry were only stopped at 1600 Point Breeze Avenue for a matter of seconds – enough time to receive the verbal description from Madara and to view the photograph of Robinson. They left the car stop just after 10:07 p.m. Because Powell thought a fleeing suspect might "go somewhere where [he] could blend in or get out like real fast," he drove to a nearby bar, Lid's Café ("Lid's"). Lid's is located at 2243 Tasker Street, one block northwest of 1600 Point Breeze Avenue. To reach Lid's, Powell drove north on Point Breeze Avenue and turned west on Tasker Street. It took Powell and Cherry less than a minute to arrive at Lid's from the car stop.

Within a minute after Powell and Cherry left the car stop, Madara radioed a second, more specific description of Robinson (the "Second Description"). This description was broadcast at 10:07:51 p.m.:

> OFFICER MADARA: It's gonna be a red hoodie, dark blue pants, it's gonna be a black male about 6 foot 1, approximately 170 to 160. Last seen westbound either on Fernon Street or on Morris.

Before Madara was able to finish his broadcast, Powell radioed:

> OFFICER POWELL: Priority. Sam-3. Gun recovered, one in custody.

F.   Officers Powell and Cherry stop and search Bey

In the moments before Officer Powell radioed that he had "one in custody," he and Cherry had

driven from the car stop to Lid's, which was still open for business and had people standing around

outside. Powell saw Defendant Bey leaving from the side entrance.[5] Bey, who had his back to the

officers, was wearing a red hooded puffer jacket and black sweatpants. Bey did not appear to be out of

breath and Powell could not see any bulges in his clothing.

Powell parked directly in front of Lid's, on the northeast corner of 23rd and Tasker. Both officers

exited their patrol car and approached Bey – Powell with his firearm drawn. When he was about 15 to

20 feet from Bey, Powell ordered Bey to turn around and show his hands. Bey immediately complied,

turning to face the officers with his hands raised. Although it was nighttime, the street lighting provided

Powell with a clear view of Bey.

Powell told Bey that someone had run from the police, and the incident had something to do with

a gun. The parties dispute whether Bey admitted to having a gun in his possession at this point.

Although Powell testified at the suppression hearing that he asked Bey whether he had a gun, to which

Bey responded, "It's in my waistband" (the "First Statement"), this alleged Statement was not

memorialized in any written record. Powell first disclosed it during a meeting with the U.S. Attorney

and an FBI agent in December 2016 – over eight months after Bey's arrest.[6]  The arrest memo, which

was entered into evidence at the suppression hearing, does not include anything reflecting this alleged

Statement.  In relevant part, it states:

> Police ordered the male to stop and show his hands to police. Police had their weapons
> drawn because of the nature of the job, a person with a gun. The male complied by

---

[5] Lid's Café has two entrances: a front entrance, at the corner of 23rd and Tasker Street; and a side entrance on 23rd Street, a
few feet north of Tasker Street. Powell testified that he saw Bey "coming out of the bar or like off of the step" in front of the
side entrance.

[6] Powell testified at the suppression hearing that he met with the U.S. Attorney and an FBI agent in preparation for this case
in December 2016. It was at that meeting that Powell first disclosed this alleged statement.

dropping to the ground as ordered by police. Police conducted a safety frisk of the male, at that time police recovered a black in color tenifer finished Glock 37 .45 ACP handgun from his front waistband.

At a preliminary hearing on state charges in the Philadelphia Court of Common Pleas, Powell, testifying on direct examination about Bey's arrest, stated as follows:

COUNSEL: Officer, did you recover anything from the defendant that evening?
POWELL: I did.
COUNSEL: What did you recover from him?
POWELL: A black and tenifer in color Glock .45 ACP caliber handgun. With permission to refer, Serial Number KZH962, loaded with one chamber round and eight additional live rounds in the accompanying magazine.
COUNSEL: Officer, where was that recovered from?
POWELL: The defendant's waistband.
COUNSEL: Could you see the firearm when you first observed the defendant?
POWELL: No, I could not.

On cross-examination at the same hearing, Powell testified:

COUNSEL: You first encountered [the defendant] coming out of a bar; is that correct?
POWELL: Yes, sir.
COUNSEL: And when you had stopped him he made no attempt to run, correct?
POWELL: Correct.
COUNSEL: And I think you candidly said that at the time that you first encountered him you could not see the gun; is that correct?
POWELL: That is correct, sir.
COUNSEL: Or you couldn't see a bulge that looked like a gun, correct?
POWELL: Correct. When I first saw the defendant his back was to me.
COUNSEL: Right. And it wasn't until you actually patted him down that you were able to feel something around his waistband; is that correct?
POWELL: I didn't feel the handgun until I patted him down from his waist, correct.
COUNSEL: And when you did pat him down, what did you feel?
POWELL: A handgun.
[. . . .]
COUNSEL: Okay. And he was on the ground at that time; is that correct?
POWELL: Correct, when I recovered the weapon.
COUNSEL: Yes?
POWELL: Yes, sir.

Given the importance of the alleged admission from Bey that a gun was in his waistband to any prosecution, and the incriminating effect of such an admission, the fact that it was not included in the arrest memo or mentioned in Powell's state court testimony – and only surfaced eight months after the

arrest, during a meeting in preparation for this case – undermines the credibility of Powell's testimony on this point.

There is no dispute that after Bey put his hands up, Powell ordered him to lie on the ground and that he complied immediately, still with his hands raised. As Bey lay on the ground, either Powell or Cherry frisked him[7] and removed a .45 caliber handgun from a holster inside the front of his waistband.

It was then, just after 10:08 p.m., that Powell broadcast over police radio: "Priority. Sam-3. Gun recovered, one in custody." This was the radio dispatch that interrupted the Second Description broadcast by Officer Madara (describing the fleeing suspect as a black male around 6'1", approximately 170 to 160 pounds, wearing a red hoodie and dark blue pants, last seen westbound on either Fernon or Morris Streets). Given the timing of Powell's "priority" dispatch, the Court finds that Madara's Second Description was broadcast after Powell stopped Bey.

Once the handgun was recovered, Powell and Cherry placed Bey in their patrol car, at which point he asked the officers why he had been stopped. Powell responded that he was stopped because he matched the description of the fleeing suspect. According to Powell, Bey then made a second statement, responding: "I ain't running from no cops," and, "You're not going to put that gun on me. That ain't mine." (The "Second Statement.")  The Second Statement was not included in either the arrest report or in Powell's state court testimony.

G.  Bey is negatively identified

Madara testified that when he heard Powell's "priority" dispatch stating that he had a gun recovered and someone in custody, he drove to Lid's to provide Powell and Cherry with back-up and to see whether the person in custody was actually Robinson. According to Madara, when he arrived at Lid's between 10:08 p.m. and 10:09 p.m., Powell and Cherry told him that Bey was not Robinson. On being advised that it was a negative identification, Madara looked at Robinson's photograph on his

---

[7] The record is inconsistent on which officer performed the frisk. At the suppression hearing, Powell testified that Cherry frisked Bey. At the preliminary hearing on state charges in the Philadelphia Court of Common Pleas, however, Powell testified that he frisked Bey.

MDT. Just after 10:09 p.m., he broadcast: "I'm on 23rd and Tasker. It's gonna be a different male than we're . . . We're still looking for Amir Robinson."

Powell offered a different account. According to Powell, he and Cherry drove Bey "back to the initial location . . . for the purpose of an identification," and it was back at the car stop that Bey was negatively identified.

Because Madara's account is consistent with the radio dispatch reporting his location at 23rd and Tasker Streets just after 10:09 p.m., the Court credits Madara's testimony on this point and finds that Bey was negatively identified outside Lid's, within one to two minutes of the stop.

## II.    DISCUSSION

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citation omitted).

Under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), however, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "Any evidence obtained pursuant to an investigatory stop (also known as a '*Terry* stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citations omitted).

Powell seeks to suppress all physical evidence and statements derived as a result of the stop and search, contending that Powell lacked reasonable suspicion in violation of the Fourth Amendment. "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a

warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). The applicable burden is proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

### A.  When was Bey seized?

The initial step of a Fourth Amendment suppression analysis is determining the moment of seizure. The moment Bey was seized is the moment "the Fourth Amendment becomes relevant." *Terry*, 392 U.S. at 16; *see United States v. Torres*, 448 F.3d 207, 210 (2006).

Bey argues that he was seized the moment he complied with Powell's command to turn around and raise his hands. The government responds that the seizure occurred when Bey complied with Powell's command to lie on the ground. The difference in the parties' characterizations is significant because anything Bey did or said *after* the moment of seizure does not factor into the reasonable suspicion analysis. "Reasonable suspicion is always evaluated as of the moment of seizure, and [courts] cannot consider facts that develop after that moment." *United States v. Lowe*, 791 F.3d 424, 436 (3d Cir. 2015).

A seizure occurs for Fourth Amendment purposes "when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *Brown*, 448 F.3d at 245 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). "'The test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" *Id.* "[I]f a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and no Fourth Amendment claim." *Id.* at 245.

Here, there was a clear show of authority when Powell approached Bey with his gun drawn and ordered him to turn around. This command would have conveyed to a reasonable person that he was

being ordered to restrict his movement. Bey submitted to that show of authority when he immediately complied with Powell's command to turn around and raise his hands. *See Lowe*, 791 F.3d at 433-34. Bey's compliance was not momentary; he continued to comply with police commands throughout the stop and frisk. Therefore, Bey submitted to the officers' show of authority, and was seized for Fourth Amendment purposes, when he turned around with his hands raised.

**B.  Was the seizure based on reasonable suspicion?**

Having determined when the seizure occurred, the next question is "whether the seizure was justified by reasonable, articulable facts known to [the officer] as of that time . . . ." *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008) (internal quotations omitted). The facts available to the officer at the moment of seizure determine whether it was supported by reasonable suspicion. *Terry*, 392 U.S. at 16, 27. "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123 (quotations omitted).

Powell testified that the only reason Bey was stopped was because he was wearing a red jacket. The pertinent question, however, is not Powell's subjective reason for the stop, but whether "'a reasonable, trained officer standing in [Powell's] shoes could articulate specific reasons justifying'" the investigative stop. *Brown*, 448 F.3d at 247 (quoting *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003)).

"In evaluating whether a particular stop was justified, courts must look at the totality of the circumstances surrounding the stop." *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004). A totality of the circumstances analysis warrants consideration of a number of factors, including: (1) the reliability of the information provided to officers that served as the impetus for the stop; (2) the reputation of the area in which the stop occurred for criminal activity; (3) the number of persons in the

vicinity; (4) the time of day or night; (5) the suspect's behavior when the officers came into his purview; (6) the geographical and temporal proximity of the stop to the alleged crime; (7) the particularity of the description and the extent to which the suspect matched it; and (8) the officers' judgments and inferences, which may be based on their own common sense or may draw upon their training, experience, and expertise. *See Wardlow*, 528 U.S. at 124; *Torres*, 534 F.3d at 210; *United States v. Brown*, 159 F.3d 147, 149-50 (3d Cir. 1998); *United States v. Goodrich*, 450 F.3d 552, 561 (3d Cir. 2006); *Bonner*, 363 F.3d at 217; *Robertson*, 305 F.3d at 167.

     1.   <u>Reasonable suspicion at the moment of seizure</u>

         a.   <u>Reliability of information provided by Fritz and Madara</u>

As an initial matter, in cases where one officer conducts a *Terry* stop (Powell) based on information provided by another (Madara), "'a finding of reasonable suspicion to justify the stop require[s] the presentation of evidence by the government that the officer who [provided the information] had reasonable suspicion, not simply that it was reasonable for the arresting officer . . . to have relied on the [information provided].'" *Brown*, 448 F.3d at 248 (quoting *United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 2002)). *See also Rogers v. Powell*, 120 F.3d 446, 453 (3d Cir. 1997) ("The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who *issued* the statements possessed the requisite basis to seize the suspect.") (emphasis in original).

Here, the information Madara received from Fritz was reliable. Madara knew that Fritz had interacted with Robinson first-hand before he fled the car stop, and therefore knew that the descriptive information Fritz provided was reliable. Additionally, Fritz handed Madara Robinson's driver's license, which Fritz had obtained directly from Robinson, and which supplied much of the information Madara broadcast in the First Description.

b.  <u>Reputation of the area for criminal activity, number of people in the vicinity, and time of day</u>

Powell testified that the vicinity in which the seizure and car stop occurred is a "high crime, high priority area." This is supported by Madara's testimony, which characterized the area as affected by narcotics offenses, gang violence, and shootings. This evidence that Bey was stopped in a high crime area weighs in favor of a finding of reasonable suspicion. *Wardlow*, 528 U.S. at 124 ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis."); *Goodrich*, 450 F.3d at 561.

The government suggests that the fact the arrest was made "at night" weighs in favor of finding reasonable suspicion. A suspect's presence on the street at a late hour can indeed support a finding of reasonable suspicion, particularly in a high crime area.[8] While 10 p.m. may be a late hour in the abstract, however, it is by no means an unusual time to be exiting a bar, particularly when other people are doing so as well. *Cf. Goodrich*, 450 F.3d at 563 (finding that the absence of other persons in the area supported reasonable suspicion). Simply being present near a bar's exit at 10 p.m., even in a high crime area – when there are other people around – does not support an inference of criminal activity under these circumstances.

c.  <u>Bey's behavior and demeanor</u>

Bey's behavior when he was observed by Powell was neither nervous nor evasive. *Valentine*, 232 F.3d 350, 357 ("'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.'") (quoting *Wardlow*, 528 U.S. at 124). Powell testified that Bey was not out of breath as he exited Lid's. Moreover, as soon as Bey became aware of the officers' presence, he immediately

---

[8] *See, e.g.*, *Adams v. Williams*, 407 U.S. 143, 147-48 (1972); *Goodrich*, 450 F.3d at 561-62 (finding, with respect to an 11:30 p.m. stop, that "[t]he lateness of the hour and the reputation of the area for criminal activity move this case closer to the elusive line separating constitutional from unconstitutional governmental action"); *United States v. Starkey*, 2014 WL 5810659, at *5 (E.D. Pa. Nov. 4, 2014) (finding that 1 a.m. was "an hour late enough to raise an officer's level of suspicion when encountering a group of individuals walking down the street, particularly in a high crime area."); *cf. United States v. Dupree*, 2009 WL 1475276, at *5 (E.D. Pa. May 27, 2009), *aff'd*, 617 F.3d 724 (3d Cir. 2010) (finding that 7 p.m. was not sufficiently late to support reasonable suspicion).

complied with their commands. There is nothing to suggest that Bey's behavior, as observed by Powell prior to the seizure, offered any indication of criminal activity.

### d.   Geographical and temporal proximity of the seizure to 1600 Point Breeze Avenue

The geographical and temporal proximity of the seizure to the reported crime is highly relevant to the reasonable suspicion analysis. *Goodrich*, 450 F.3d at 562 (holding that a *Terry* stop within seven minutes and "one or two blocks" from a reported theft was temporally proximate and "in the immediate vicinity" of the crime); *Brown*, 159 F.3d at 150 (finding a stop occurring "near the crime scene," "a few minutes after the [report]," to be "in close proximity"); *Starkey*, 2014 WL 5810659, at *5 (E.D.Pa. 2014) (finding a stop within five minutes and a few blocks away from a robbery proximate to the crime; *cf. United States v. Dupree*, 2009 WL 1475276, at *5 (E.D. Pa. May 27, 2009), *aff'd*, 617 F.3d 724 (3d Cir. 2010) (finding that a stop seven blocks away from the crime scene was not geographically proximate).

Here, the seizure occurred close to the car stop six to seven minutes after Fritz's Initial Dispatch. Bey was seized one block northwest of 1600 Point Breeze, no more than seven minutes after Robinson fled. The location of the seizure was consistent with Robinson's reported direction of flight, *i.e.* westbound from Point Breeze Avenue on either Fernon or Morris Streets. Therefore, the timing and location of the stop weighs in favor of reasonable suspicion.

### e.   Particularity of the description and the extent to which it matched Bey

Finally, the description of the suspect and the extent to which Bey matched that description must be considered in the totality of the circumstances analysis. *Goodrich*, 450 U.S. at 560. "'To suffice, the description must permit the police to be reasonably selective in determining who to stop for investigation, and whether this may be said to be the case will depend upon how many persons are in the universe of potential suspects.'" *Id*. at 561 (quoting 6 Wayne R. LaFave, Search and Seizure § 9.5(g) (2004)).

Of critical importance in this case, therefore, is what Powell knew about the fleeing suspect when he came upon Bey exiting Lid's. At that point in time, Powell had heard broadcast over police radio the First Description, which relayed that the suspect was a man by the name of Amir Robinson, wearing a red hoodie, date of birth 8-6-94, last seen westbound on Fernon Street. He had also received a verbal description from Madara at the car stop, which added that Robinson was black, 6' to 6'1", about Madara's size but skinnier, around 160 to 170 pounds, wearing dark blue pants, fleeing westbound on either Fernon or Morris Streets. Powell testified that, as part of this verbal description, Madara told him that Robinson was wearing either a red hoodie or a red jacket. Finally, Powell had seen a photograph of Robinson. Thus, before Powell seized Bey, he knew Robinson's ethnicity, gender, date of birth, approximate height and build, direction of flight, and the fact he was wearing dark blue pants and either a red hoodie or a red jacket.

Although Powell testified that the only reason Bey was stopped was because he was wearing a red hooded jacket, we must consider only whether "a reasonable, trained officer standing in [Powell's] shoes could articulate specific reasons justifying" the stop. *Brown*, 448 F.3d at 247 (quoting *Johnson*, 332 F.3d at 206). Accordingly, even if the other descriptors did not factor into Powell's reasonable suspicion analysis, they are relevant here.

When Powell saw Bey exiting Lid's, Bey was facing away from the officers. From his vantage point, Powell could see that Bey was a black male wearing a red hooded jacket. A reasonable officer in Powell's position would have been able to see that Bey was wearing black sweatpants. Bey points to clothing description discrepancies – a red hooded puffer jacket as opposed to a red hoodie, and black sweatpants instead of dark blue pants – in support of his position that he did not match Robinson's description when the seizure was initiated.

The discrepancies between Robinson's description and Bey's appearance prior to the moment of seizure are, however, insufficient to render the stop unconstitutional. *Starkey*, 2014 WL 5810659, at *5

("[W]here there is some discrepancy between the [individual] stopped by the police and a general or vague description provided to the police, this discrepancy *alone* will not necessarily render the stop unconstitutional.") (emphasis in original);[9] *Goodrich*, 450 F.3d at 560-61 (finding the stop of a woman and a man constitutional where an informant's tip described two women, in light of other factors justifying heightened suspicion).

When Powell saw Bey, he observed a black male wearing a red hooded jacket and dark pants one block northwest of the car stop – a location consistent with Robinson's direction of flight – six to seven minutes after Robinson fled. Powell had not observed anyone fitting Robinson's description between the vehicle stop and Lid's. The description was sufficiently particularized to permit the police to be reasonably selective in determining whom to stop for investigation. It is not unreasonable that a police officer would perform an investigatory seizure of a black male wearing a red hooded jacket and dark pants under these circumstances, given the geographic and temporal proximity of the seizure to the car stop, and the fact that the location was a high crime area.

Bey likens this case to *Brown*, 448 F.3d 239, in which the Third Circuit reversed the district court's denial of a suppression motion based in part on discrepancies between the appellants and the description of the suspects. But the match in *Brown* was "wildly wide of target." *Id.* at 248. The *Brown* appellants exhibited vastly different physical attributes to the suspects,[10] and – crucially – those discrepancies were visible to the officers *before* the moment of seizure, since the officer in *Brown* had a "brief conversation" with the appellants prior to seizing them. *Id.* at 243, 252. Here, by contrast, Bey

---

[9] In *Starkey*, the Court found the seizure of a black man, observed with two black women, constitutional where the radio dispatch described three black male suspects, in light of other group characteristics that aligned with the description and additional indicia of criminal activity. *Starkey*, 2014 WL 5810659, at *5.

[10] The broadcast in *Brown* identified the suspects as African-American males between 15 and 20 years of age, wearing dark, hooded sweatshirts and running south on 22nd Street, where one male was 5'8" and the other was 6'. Appellants Brown and Smith were stopped roughly three blocks south of the crime scene as they came out of a store with cups of coffee. *Brown*, 448 F.3d at 242. On the date of the stop, Brown was 28 years old and Smith was 31 years old. Both had full beards, when the description included no mention of facial hair. The Third Circuit found that "the only thing Brown and Smith had in common with the suspects was that they were black." *Id.* at 248.

was facing away from Powell at the stop's inception, and his appearance from the back generally matched Robinson's description.

Moreover, the stop in *Brown* was based on a tip from a civilian who had not witnessed the crime, and which "would not have established reasonable suspicion in the mind of a reasonable, trained officer." *Id*. at 251. Since the tip was "insufficient on its own to support reasonable suspicion," it required "more information . . . to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id*.

2.   Whether the reasonable suspicion that Bey was Robinson was dispelled

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id*. The burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration is on the government. *Id*.

"[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). "[T]he reasonableness of a detention may be determined in part by 'whether the police are diligently pursuing a means of investigation which is likely to resolve the matter one way or another very soon . . . .'" *Michigan v. Summers*, 452 U.S. 692, 701 n.14 (1981) (quoting 3 Wayne R. LaFave, Search and Seizure § 9.2 at 40 (1978)). *See also United States v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013) ("Once reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable suspicion violates the Fourth Amendment.") (quotations omitted).[11]

---

[11] *See also United States v. Davis*, 430 F.3d 345 (6th Cir. 2005) ("The Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions . . . . Officers must act to confirm or dispel their suspicions quickly.").

The initial stop of Bey was justified at its inception. When Powell and Cherry seized Bey, they had reasonable suspicion to believe that he was Robinson. That suspicion justified them detaining Bey briefly in order to verify or dispel their suspicions that he was in fact Robinson. *Royer*, 460 U.S. at 500.

Bey points out that, physically, he is very different than Robinson, and that the differences would have been evident to Powell as soon as Bey turned around: at that point Powell would have been able to see that Bey was dark-skinned (as compared to Robinson who was light skinned), with a full beard (a description that was not contained in the information Powell had been supplied), approximately 200 pounds (much heavier than Robinson) and that Bey was significantly older than Robinson (32 years old on the date of the stop – over ten years older than Robinson). Powell had seen a photograph of Robinson on his MDT approximately one minute earlier, prior to leaving the car stop. A photograph of Robinson that was entered into evidence revealed that Robinson is a light-skinned black male of youthful appearance, with a tattoo covering the front of his neck, a short moustache, narrow sideburns, and a small amount of facial hair underneath his chin. The probative value of the photograph is, however, questionable, since it was taken over five months after Bey's arrest. The photograph Powell saw was not entered into evidence at the suppression hearing.

The *actual* photograph Powell saw was not entered into evidence and, given that the photograph that was admitted into evidence was taken months after the events at issue here, the Court cannot evaluate the differences between the photograph that Powell saw of Robinson and what Bey looked like when he saw him exiting Lid's.

Bey's argument would suggest that, since Powell knew the identity of the fleeing suspect, he should have conducted further investigation to determine Bey's identity prior to seizing him. But the Supreme Court has cautioned that "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to indulge in

18

unrealistic second-guessing." *United States v. Sokolow*, 490 U.S. 1, 11 (1989) (quotations and citations omitted). Similarly, the Third Circuit has counseled that courts should be "reluctant to 'second-guess' investigative decisions made by officers in hot pursuit of criminal suspects." *Robertson*, 305 F.3d at 167 (quoting *Valentine*, 232 F.3d at 355); *see also United States v. Edwards*, 591 Fed. Appx. 156, 159-60 (3d Cir. 2014) (finding that reasonable suspicion did not evaporate as to appellant – the perpetrator of a bank robbery – when another suspect was incorrectly identified as the perpetrator, based in part on the investigation involving a "swiftly developing situation," and declining "on this record to second-guess the investigative decisions made by the law enforcement officers on the scene . . . .") (quotations omitted).

Accordingly, the seizure was justified at its inception, and the record evidence does not support a finding that reasonable suspicion was dispelled.

### C.  Was the frisk based on a reasonable belief that Bey was armed and dangerous?

The determination that the seizure was justified by reasonable suspicion does not end the inquiry, however. "The stop and the search are independent actions, and each requires its own justification." *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (citing *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009)). Thus, even if the stop was justified by reasonable suspicion, the subsequent frisk of Bey's person must also have been reasonable under the Fourth Amendment.

A person subject to a warrantless *Terry* stop "may be frisked for weapons if the police have a reasonable belief that the person is armed and dangerous." *United States v. Connolly*, 349 Fed. Appx. 754, 756 (3d Cir. 2009) (citing *Terry*, 392 U.S. at 27). "In reviewing a . . . *Terry* frisk for reasonable suspicion, 'the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* at 757 (quoting *Terry*, 392 U.S. at 27). The officer need not be "assured," however, that the suspect is armed. *Terry*, 392 U.S. at 27.

In the present case, Powell testified that after the moment of seizure but immediately prior to the frisk, Bey admitted to possessing a firearm. Specifically, on being asked by Powell whether he had a gun on his person, Bey allegedly replied, "It's in my waistband." A suspect's admission that he is armed can justify a search. *See, e.g.*, *United States v. Street*, 614 F.3d 228, 234 (6th Cir. 2010); *Broadnax v. Borough of North Plainfield*, 2011 WL 2971275 at *7 n.10 (D.N.J. July 20, 2011).

The credibility of Powell's testimony as to this alleged First Statement is questionable, as discussed *supra*. Regardless of whether Bey admitted to possessing a firearm in his waistband, however, the frisk was justified based on the officers' reasonable belief that Bey was armed and dangerous. Powell and Cherry were in pursuit of a suspect fleeing a car from which two firearms had been recovered six to seven minutes earlier, in a high-crime area known for gun violence and narcotics offenses. There is no dispute that the officers were aware that firearms were recovered from the car; both Fritz and the police dispatcher broadcast that fact prior to the moment of seizure. Powell indisputably heard Fritz's dispatch that he had "a gun recovered and the passenger bailed," since he responded by asking what the passenger was wearing.

Where "officers believe [a defendant] to have a firearm, they [are] permitted by *Terry* to conduct a limited search for weapons." *Gatlin*, 613 F.3d at 379. "[B]ecause the 'purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence,' the frisk (so long as it is conducted pursuant to a lawful stop) may be permissible 'whether or not carrying a concealed weapon violate[s] any applicable state law.'" *Id*. (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

In the instant Motion, Bey argues that the officers "did not possess any information that he was armed and dangerous," noting that the suspect they were searching for had discarded his firearm on the front passenger floorboard of the Buick. But there is no evidence that Powell and Cherry knew this. Rather, they were responding to a report of a fleeing suspect who was running from a car in which guns

were recovered. The presence of one weapon can inform a reasonable belief that a suspect possesses additional weapons. *See, e.g.*, *United States v. Yamba*, 506 F.3d 251, 255 (3d Cir. 2007) (finding an officer's observation that a suspect held an open pocket knife to be a relevant factor justifying a search for additional weapons); *United States v. Vinton*, 594 F.3d 14, 20 (D.C. Cir. 2010) (holding that an officer who removed a knife from a suspect and placed it out of arm's reach was "justifiably concerned that additional weapons might be hidden elsewhere in the vicinity."); *United States v. Christian*, 187 F.3d 663, 669 (D.C. Cir. 1999) ) ("The presence of one weapon may justifiably arouse concern that there may be more in the vicinity."). Moreover, knowledge that a suspect was recently armed can support a reasonable suspicion that the suspect is *presently* armed and dangerous. *See, e.g.*, *United States v. Adamson*, 441 F.3d 513, 521-22 (7th Cir. 2006). Accordingly, the government has met its burden of showing, by a preponderance of the evidence, that the frisk was reasonable.

The unfortunate fact that Bey was not, in fact, the suspect police were looking for does not change this conclusion. Once a lawful *Terry* stop is made, circumstances indicating that the seized suspect is armed and dangerous – including the extent to which the suspect fits the description of an armed and dangerous individual – can warrant a frisk for weapons. *See, e.g.*, *Kithcart III*, 169 F.Supp.2d 369, 375 (E.D. Pa. 2001), *aff'd*, 34 Fed. Appx. 872 (3d Cir. 2002).

**D.  Should Bey's alleged Statements be suppressed?**

Finally, Bey seeks suppression of both the First and Second Statements, in which he allegedly admitted to having a firearm in his waistband and denied that it belonged to him. Bey argues that these Statements must be suppressed as fruits of the unconstitutional *Terry* seizure. Bey is correct that both purported Statements occurred after the moment of seizure. Because neither the stop nor the frisk violated the Fourth Amendment, however, this argument is unavailing.

Assuming *arguendo* that the Statements were made, it is undisputed that Bey made them without being provided the warnings required when an individual is subject to custodial interrogation as per

*Miranda v. Arizona*, 384 U.S. 436, 477-79 (1966). However, the government correctly argues that the Statements are admissible at trial because the factual circumstances that generated them fall under the public safety exception to *Miranda*, as articulated in *New York v. Quarles*, 467 U.S. 649 (1984) (holding that, prior to advising a suspect of their *Miranda* rights, a law enforcement officer may ask questions of a suspect for the limited purpose of protecting the public from possible harm, and holding that those statements are admissible in evidence). *See also United States v. Savage*, 677 F.Supp.2d 756, 763-64 (E.D. Pa. 2009) (finding that even if the defendant's statement that he had a gun was made during a custodial interrogation and without *Miranda* warnings, the statement was admissible under the *Miranda* public safety exception).

Because the seizure was justified at its inception, reasonable suspicion was not dispelled, and the frisk was justified by a reasonable belief that Bey was armed and dangerous, the Motion is denied.

An appropriate Order follows.

Dated: **March 6, 2017**

**BY THE COURT:**


**/s/ Wendy Beetlestone**

**_____**

**WENDY BEETLESTONE, J.**